EXHIBIT A

EXHIBIT A

IN THE CIRCUIT COURT OF THE
9th JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

CHANTEL PRESTON, as Guardian
of J.B.S.,

        Plaintiff,                      CASE NO.:  2019-CA-015363-O

v.

ORANGE COUNTY SCHOOL BOARD, a
Governmental entity, d/b/a Apopka High School;

        Defendant.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

        Plaintiff, Chantel Preston, as Guardian of J.B.S, through the undersigned attorneys, sues Defendant, Orange County School Board (OCSB), and alleges:

### Introduction

        This case is about the Orange County School Board's callous indifference to multiple reports that female special needs student J.B.S. was being sexually harassed and assaulted while in school custody. Almost nothing was done to investigate and stop the harassment. As a result, J.B.S. suffered physical injury, psychological harm, and was denied equal access to an education.

### Parties, Jurisdiction, and Venue

        1.     This is an action for damages in excess of Thirty Thousand Dollars ($30,000) exclusive of interest, costs, and attorney's fees.

        2.     Plaintiff, Chantel Preston, is a resident of Orange County, Florida.

        3.     J.B.S., identified by her initials to protect her identity, is a resident of Orange County, Florida.  At the time of the events described in this Complaint, J.B.S. was a minor under the age of 18.  The actual identity of J.B.S. is known to Defendant.

4.     Plaintiff has been appointed Plenary Guardian Advocate of the Person and Property of J.B.S. and brings this case in that capacity.  The redacted Order appointing her is attached hereto as Exhibit A.

5.     Prior to her formal appointment as Plenary Guardian Advocate of the Person and Property of J.B.S., Plaintiff was J.B.S.'s natural guardian.

6.     Defendant is a political subdivision of the State of Florida and is responsible for administering Orange County Public Schools, including Apopka High School.  At all times material, Defendant was a state actor acting under the color of state law.

7.     At all times material, Defendant owned and operated Apopka High School, a public high school providing educational services in Orange County, Florida.

8.     Venue is appropriate in Orange County, Florida, because that is where the acts alleged in this lawsuit occurred.

9.     Plaintiff has complied with all conditions precedent, if any, to bringing this action against Defendant.

<u>**General Allegations**</u>

10.     J.B.S. has developmental delays, language impairment, and an intellectual disability. According to speech therapy evaluation, she communicates on approximately the level of a four-year-old.

11.     J.B.S lacks the ability to meaningfully advocate for herself and is frequently unaware of the difference between right and wrong.  As a result, she is dependent on others to protect her from harm.

12.     At all times material, J.B.S. was a student at Apopka High School who qualified for Exceptional Student Education (ESE).

13.    ESE students are those with disabilities who need specially designed instruction and related services.  The purpose of ESE is to help each child with a disability progress in school and prepare for life after school.

14.    For each ESE student, the school must create an Individualized Education Plan (IEP) that provides a written plan and process to ensure that the needs of each ESE student are met.  IEPs are created by a multidisciplinary team that includes general education teachers, special education teachers, and a school system representative who knows about special education services and is authorized to commit resources.

15.    Defendant recognized that J.B.S.'s condition made her vulnerable to harm, and that supervision was required to ensure her safety. For instance, J.B.S.'s October 2017 IEP states in pertinent part:

> [J.B.S.] requires direct assistance for almost all learning activities.  [She] struggles at times to understand what has been requested of her or to respond to requests made to her.  She is at risk, due to limited understanding of being taken advantage of by others and requires supervision to ensure her safety.

16.    Defendant also recognized that J.B.S.'s condition made her highly susceptible to peer pressure:

> "[J.B.S.] at times lets peers put pressure on her to do things that she would not normally do, such as giving them her food in the cafeteria, or other items that she may have.  Per her report, she does not stand up to these peers and usually gives in to the pressure."

17.    And in the "Conference Notes" at the end of the IEP, Defendant further acknowledged J.B.S.'s vulnerability:

> [J.B.S.] is a sweet student who wants to do well, is a people pleaser.  We are working on having [J.B.S.] speak up to her peers when she doesn't want to do something they want her to do or knows she shouldn't do it.  *[J.B.S.] is unaware of possible dangers with regard to other people, and the possibility of others taking advantage of her and her sweet nature.*  [Emphasis added.]

3

18.     Defendant was aware that J.B.S. lacked the capacity to consent to sexual contact.

19.     Despite this knowledge, Defendant permitted J.B.S. to be inadequately supervised, by requiring the teacher or paraprofessional supervising her to be responsible for too many students, under circumstances where continuous supervision of J.B.S. would not be possible or practicable. This occurred both during class time, as well as during HOPE gym class, when multiple classes of students were combined.

20.     Defendant had specific knowledge that commingling vulnerable students like J.B.S. with other students who were known by Defendant to have behavioral issues, would result in an unsafe environment and expose J.B.S. to harm.

*The Classroom Incident*

21.     On or about February 23, 2017, a substitute teacher was tasked with supervising Ms. LeRhea Edwards' ESE classroom, to which J.B.S. was assigned. Ms. Edwards and the paraprofessionals typically assigned to the classroom were in an IEP meeting.

22.     During said class, the substitute teacher showed the class a video and dimmed the lights in the classroom.

23.     The substitute teacher was the only adult in the classroom, leaving the students within the class inadequately supervised.

24.     L.H., a male student who was known by this Defendant to have behavioral problems, was also in the classroom. Defendant is aware of L.H.'s name.

25.     Upon returning to classroom, Ms. Edwards was approached by a student in the classroom, L.P., who reported that he had witnessed sexual contact between J.B.S. and L.H. in the classroom.

26.     According to Ms. Edwards, L.P. was not a student who was known to fabricate allegations about other students and was a student who could accurately report events that had just occurred within the last hour.

27.     Based on what L.P. told her, Ms. Edwards immediately reported the incident to Assistant Principal and ESE Administrator Daina Cooke-Weaver.

28.     Ms. Preston was called to the administrative offices and advised that an investigation would be underway related to these serious reports. Edward Coffie, a disciplinary dean working under AP Cooke-Weaver, was tasked with the investigation.

29.     A statement should have been taken from L.P. regarding his observations. No such statement exists.

30.     The next day, on February 24, 2017, L.P. approached Ms. Preston and advised her privately that he witnessed L.H. have J.B.S. perform oral sex on him, and that he touched her inappropriately during the movie.

31.     OCSB has been unable to produce a single witness statement collected in connection with this serious allegation—not even a witness statement from J.B.S.

32.     A School Resource Officer, who was notified of the allegation, conducted his own investigation for law enforcement purposes. He concluded that something inappropriate likely occurred in the event but lacked adequate evidence to pursue the high bar of criminal prosecution.

33.      Despite L.P. informing school employees that he witnessed the sexual assault, Ms. Cooke-Weaver and/or Mr. Coffie decided there was not enough information to say conclusively whether the sexual assault occurred. As a result, no further action was taken.

34.     In fact, Defendant's Discipline Procedure Guide required a safety plan to be created whenever there is an allegation of sexual harassment whether substantiated or unsubstantiated. But no safety plan was implemented at that time for J.B.S.

35.     On March 9, 2017, Ms. Preston emailed Ms. Cooke-Weaver to express her frustration with the school's lack of response to the February 23rd incident:

> I have waited on the statement that you said you would have for me and my daughter [J.B.S.] on Thursday February 23, 2017 [.] The same day of the sexual harassment that my daughter have been through. You called me and [J.B.S.] up in a meeting about her have oral sex with one of the other students in her classroom but then come to find out she also been touch on by student on her breast and butt… You said you was going to make a statement for [J.B.S] and then she can signed when you finish the statement. Ye[t] I seen you the next day in the morning and you said it's not ready but u still working on it and that you will investigate a little more.

In the email, Ms. Preston stated that L.P. informed her that he witnessed the incident between L.H. and J.B.S.:

> On Friday February 24, 2017, when [L.P.] was help bring my things to my car and yes [L.P.] volunteer to help me. But on our way back to classroom I ask him what he wanted to talk to me about, before me and [J.B.S.] went up to the meeting with you and Ms Edward. Than [L.P.] said yes it happen I then said what happened that the other student had [J.B.S.] to do oral sex on him and that he touched her inappropriate. Why they was watching a movie… The classroom was out of ratio. [L.P.] said this to another staff too but he didn't want to do a statement.

Ms. Preston also stated that J.B.S. no longer went to eat breakfast at school because students continued to harass her about what happened:

> I see others students looking at [J.B.S.] when she walk by going to Ms Edward class pointing at her and laughing it hurts to me see that because I'm wondering if they laughing about what happened in the classroom. [J.B.S.] do not go eat breakfast no more in the morning, she said because they keep talking about that what happen on February 23, 2017. It's hurting very bad and see your child dealing with this!

Despite receiving this email, and being notified of additional harassment J.B.S. was experiencing, the school took no further action to address Ms. Preston's concerns or to re-open the investigation of the February 23rd sexual assault.

*The Gym Incident*

36.     On November 30, 2017, during school hours, J.B.S. was in the gym with other students for a scheduled fitness-related activity for the HOPE class.

37.     Defendant failed to have adequate personnel present to supervise the ESE students during the gym activity.

38.     Julie Williams, a paraprofessional at Apopka High School, was tasked to bring her assigned class of ESE students, along with approximately two other classes, to the gym for the HOPE gym class.

39.     Ms. Williams was accompanied by another paraprofessional named Devin Wade. However, Mr. Wade was assigned to a specific student for one-on-one supervision.

40.     Prior to heading over to the gym, Ms. Williams took a head count of her assigned students. J.B.S. was present. L.H. was not present.

41.     L.H. was known to skip class and was frequently found in places on school campus other than his assigned location. In the weeks leading up to the November 30, 2017, L.H. was suspended from school twice. On September 25, 2017, he was suspended for three days for gross insubordination and open defiance.  On November 16, 2017, L.H. was suspended for two days for gross insubordination and open defiance for failing to report to "positive alternative to in-school suspension," or PASS.

42.     When Ms. Williams arrived at the gymnasium with her students, she saw that there were about 80-100 students present, including the ESE students she and Mr. Wade had brought there. The students in the gym at that time included students from various grade levels, with and without special needs.

43.     Ms. Williams looked for Julie Thomas, who teaches the HOPE class, to find out what activity they were going to have the ESE students do for the day. However, Ms. Thomas could not be found.

44.     Ms. Williams was then left to supervise all of her students on her own, while Mr. Wade supervised the student he was assigned to supervise as part of the student's one-on-one IEP

plan. At some point, Ms. Williams also found herself assisting in the supervision of another paraprofessional's students. At this point, Ms. Williams was put in the position of supervising far too many students to keep an accurate head count of her assigned students, let alone the type of continuous supervision of J.B.S. needed in this unstructured environment.

45.     Approximately 10-15 minutes after arriving at the gym, Ms. Williams realized that J.B.S. was not present, and immediately sought out in search of J.B.S.

46.     The bathrooms located in the hallway adjacent to the gymnasium were supposed to be locked. However, on surveillance footage, J.B.S. can be seen freely opening the unlocked bathroom door without adult supervision or assistance.

47.     On surveillance footage, L.H. is seen entering the bathroom that J.B.S. entered, a few seconds behind her.

48.     While in the bathroom, L.H. sexually assaulted J.B.S.

49.     Ms. Williams, who was calling J.B.S.'s name, eventually found J.B.S. in the bathroom crying, and testified that she observed blood on J.B.S.'s pants.

50.     Ms. Preston was called to the gym, where she comforted and examined her daughter. Ms. Preston observed blood on J.B.S.'s underwear. J.B.S. was not menstruating at the time. After interviews with officers, Ms. Preston took J.B.S. to a clinic, where she could be tested and given a "morning after" pill.

51.     L.H. was later arrested for the assault by responding offers.  He reported to investigating officers that he knew J.B.S. was "not right in the head," believing her to have Downs Syndrome.

52.     During the interview with officers, L.H. also references an incident or allegation during the previous school year involving himself and J.B.S.

53.     On December 12, 2017, a meeting was held at Ms. Preston's request to address concerns for J.B.S.'s safety and supervision. The meeting notes outlined a few concrete steps to improve J.B.S.'s supervision at specific times. However, most of the proposed "new" actions were measures that were supposed to have already been in place. These proposed actions failed to ensure J.B.S.'s safety.

54.     J.B.S. took several months off from school. When she returned, she had trouble returning to gym class, and Mrs. Preston remained concerned that J.B.S. still did not have adequate supervision.

55.     On April 9, 2018, Ms. Preston emailed the assistant principal, Bradley Martin, and expressed her concerns for J.B.S.'s safety:

> Good evening Mr. Martin I'm emailing you because I'm a little concerned about [J.B.S.] reaction being in the gym where the incident have happen her behavior is very emotional, crying still at home and today with her [counselor]. [J.B.S.] do not feel comfortable been in the gym right now. I have explain the situation with her teacher Ms. [Wambles]. I'm disturbing to me [to] have [J.B.S.] still in the gym where the sexual abuse happened at, so having a male teacher assistant. **I'm requesting one on one** for [J.B.S.] because this is the second time this sexual abuse happened by the same student plus she still in the gym where the incident happened.

56.     Though Ms. Preston requested one-on-one supervision for J.B.S.'s safety, the school never fulfilled her request.

*The Second Classroom Incident*

57.     On or about October 4, 2018, a paraprofessional took J.B.S. and another student, Jane Doe, to Rochelle Conyers office, who was a disciplinary dean at the time, to inform Ms. Conyers about the incident that was alleged to have occurred on or about October 1, 2018.

58.     Ms. Conyers assisted J.B.S. in authoring a statement, which read:

On Monday 10/1/18, [M.B.] touched my butt. He was digging in my butt with his fingers. He said he is going to put his penis in my butt and private part. He touched

my boobs. He asked me to show him my boobs. He told me and [Jane Doe] he would do the same thing to her.

59.     Ms. Conyers did not take any steps after receiving the statement to separate J.B.S or Jane Doe from M.B.

60.     On October 11, 2018, Ms. Preston emailed Ms. Conyers asking what disciplinary actions were implemented in response to M.B.'s conduct because Ms. Preston and J.B.S. saw that M.B. was still in school. Ms. Preston expressed concern that M.B. was still allowed to be in school, interacting with her daughter, in light of the alleged sexual assault.

61.     On October 22, 2018, Ms. Preston again emailed Ms. Conyers and asked to receive an incident report. Ms. Conyers responded stating that she would only receive a copy of a discipline referral form, that they are not issuing her a referral, and "[t]he investigation is on going…"

62.     The school has been unwilling to produce any statements gathered during the course of this investigation except that of J.B.S.

63.     Sometime after October 22, 2018, Ms. Conyers concluded that the incident was "unfounded." Ms. Conyers testified that this conclusion was based on reviewing attendance records from the date in question, which revealed that M.B. was off campus—at least for part of the day.  In fact, attendance records show that M.B. was "tardy" to J.B.S.'s class—not absent.

64.     Requesting J.B.S.'s school records, alone, would not have revealed any of the above-described instances. These allegations were only known to the undersigned because Ms. Preston became aware of them around the time that they occurred, and voiced her concerns in writing, insisting on receipt of incident reports.

65.     OCSB's agents and employees are mandatory reporters of child abuse and neglect. In seeking further corroboration of these incidents and witnesses thereto, the undersigned sent a

records request to the Department of Children and Families (DCF). The undersigned learned that OCSB did not report the February 2017 allegations.

*The School Bus Incident*

66.     Through receipt of DCF's reports, the undersigned learned that there was yet another confirmed incident, occurring on or about July 15, 2015.

67.     On the last day of summer school, J.B.S. and seven other students were riding home on the school bus. The bus monitor charged with supervising J.B.S. was sitting at the front of the bus. The bus monitor was not maintaining line of sight supervision on J.B.S. Video surveillance captured J.B.S. engaging in what was presumed to be inappropriate sexual activity with another student on the bus. According to the investigator's report, further review of on-board video surveillance revealed that this did not appear to be an isolated incident.  When the undersigned requested surveillance footage from OCSB, she was advised it no longer had any.

68.     OCSB was aware of the July 15, 2015, incident. Ms. Preston was not informed of what had occurred, despite OCSB's representations to DCF that it was notifying parents of the involved students. OCSB has been unable to produce a single document evidencing notification of Ms. Preston or discussion of this serious incident.

### COUNT I – NEGLIGENCE AGAINST ORANGE COUNTY SCHOOL BOARD d/b/a APOPKA HIGH SCHOOL

69.     Plaintiff re-alleges the allegations in paragraphs 1 through 68.

70.     Defendant had a duty to reasonably supervise its students during all activities that are subject to the control of the school.

71.     Defendant's duty to supervise its students required Defendant's administrators, teachers, and other employees to act with reasonable care under the circumstances.

72.     Defendant owed J.B.S. a duty to hire qualified and competent administrators, teachers, and other employees to work within its schools.

73.     Defendant owed J.B.S. a duty to train its employees and agents, including but not limited to its administrators, to act with reasonable care under the circumstances. This included training them in appropriate investigation and reporting of instances of sexual harassment and assault. It also included training them about creating and implementing appropriate safety plans to protect vulnerable students from harm.

74.     Defendant owed J.B.S. a duty to supervise its employees and agents.

75.     Defendant also owed J.B.S. a duty to terminate any employees and agents that it knew or should have known could not act with reasonable care under the circumstances.

76.     At all times material, Defendant owed J.B.S. a duty to act with reasonable care under the circumstances.

77.     Defendant's duty to J.B.S. included the duty to use reasonable care to keep her safe from other students during school.

78.     Given J.B.S.'s disorders and vulnerabilities, which were known to the Defendant, Defendant's duty to J.B.S. required a heightened level of supervision than would otherwise be imposed, as evidenced by her IEP.

79.     Failing to provide adequate supervision to a student who lacked awareness of possible dangers, who lacked capacity to consent to sex, and who was known to acquiesce to the requests of others and be taken advantage of, exposed J.B.S. to patently offensive sexual harassment, exposure, and assault.

80.     Defendant breached its duties to J.B.S. by:

   a.   Failing to consistently and reliably provide the level of supervision determined to be necessary by  J.B.S.'s IEP;

   b.   allowing L.H. and/or M.B. to sexually assault and harm J.B.S. during school;

   c.   failing to provide a safe environment for J.B.S. where she would not be harmed by other students, including L.H. and M.B.;

   d.  failing to procure or develop policies and procedures to prohibit harm to J.B.S. and
       other ESE students;

   e.  failing to investigate facts regarding L.H. and/or M.B. that demonstrated a likely
       potential for L.H. and/or M.B. to harm J.B.S.;

   f.  failing to provide reasonable surveillance, investigation, and reporting of students
       to prevent or detect inappropriate student conduct, such as the conduct of L.H.
       and/or M.B. in harming J.B.S.;

   g.  failing to hire competent and qualified employees or agents with the knowledge
       and training needed to properly supervise students and protect J.B.S.;

   h.  failing to train its employees or agents to properly supervise and protect students
       like J.B.S.;

   i.  failing to train its employees or agents to develop and implement safety strategies
       to protect students like J.B.S following reports of sexual harassment and assault;

   j.  failing to supervise its employees or agents in a proper manner to protect J.B.S.;
       and

   k.  failing to provide adequate personnel support to employees or agents who were
       unable to properly supervise and protect J.B.S

81.    As a direct and proximate result of Defendant's conduct, J.B.S. suffered bodily
injury, pain and suffering, disability, mental anguish, psychological injuries, and other permanent
or continuing losses.

82.    As a further direct and proximate result of Defendant's conduct, Plaintiff incurred
medical and psychological expenses for the treatment of her injuries and will incur additional
expenses in the future.

WHEREFORE, Plaintiff demands judgment for damages, including pre-judgment and
post-judgment interest to the extent allowed by law, plus costs of suit, and demands trial by jury
of all issues.

## COUNT II – VIOLATION OF TITLE IX

83.    Plaintiff realleges the allegations in paragraphs 1 through 68.

13

84.     Title IX of the Education Amendments of 1972, provides, with limited exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

85.     Defendant is a Title IX funding recipient.

86.     Title IX damages arise when school officials with authority to take corrective action have actual knowledge of student-on-student sexual harassment and their response is deliberately indifferent, i.e., clearly unreasonable under the known circumstances.

87.     The sexual harassment, including multiple sexual assaults, suffered by J.B.S. was so severe, pervasive, and objectively offensive that it had the systemic effect of denying her of equal access to certain educational opportunities and benefits provided by Defendant.

88.     Beginning in February of 2017, School District officials with authority to take corrective measures in response to student-on-student sexual harassment at Apopka High, including AP Cooke-Weaver and Dean Coffie, acted with deliberate indifference to the severe, pervasive, and objectively offensive sexual assault committed by L.H. on or about February 23, 2017.

89.     The investigation conducted by School Officials in response to the February 23, 2017, sexual assault was inadequate as they failed to create and/or keep records of witness statements. The basis upon which the incident was determined to be "unfounded" is totally unclear. Neither the Title IX coordinator, nor the Department of Children and Families were ever informed of the incident.

90.     When Ms. Preston informed assistant principal, Ms. Cooke-Weaver, of L.P.'s eyewitness account and the additional harassment J.B.S. was suffering, Ms. Cooke-Weaver took

no further actions, and no safety plan was ever implemented to protect J.B.S. from further harassment and assault.

91.     School officials, including assistant principal, Bradley Martin, were also aware that J.B.S. was the victim of severe, pervasive, and objectively offensive conduct when she was raped by L.H. in November of 2017. Yet school officials again acted with deliberate indifference by failing to implement a true safety plan or setting up procedures to ensure J.B.S. was always supervised for her own safety following the incident.

92.     On October 1, 2018, Rochelle Conyers, who had authority to take corrective actions, became aware that J.B.S. was once again sexually assaulted by a fellow student in the classroom. Despite Defendant's knowledge of this severe, pervasive, and objectively offensive sexual assault, Defendant acted with deliberate indifference by failing to implement a safety plan to ensure J.B.S. was protected during school hours.

93.     During all relevant periods, the Defendant had substantial control over the environments in which J.B.S. was harassed—including the classroom, the school gymnasium, and the school bus.  Defendant also had substantial control, including authority to discipline, the students who were engaging in harassment of J.B.S. Had Defendant not been deliberately indifferent to the notices that J.B.S. was being harassed, it would have investigated the allegations while promptly taking necessary steps to ensure J.B.S.'s supervision remained constant and that her environments were adequately staffed to effectuate this need. If that could not be accomplished, alternative arrangements needed to be considered, such as one-on-one supervision.

94.     Following the February 2017 classroom incident, immediate steps should have been taken to separate J.B.S. from L.H. Instead, he remained assigned to her same classroom, to attend all of her classes with her, until he raped her in November.

95.     As a direct and proximate result of Defendant's deliberate indifference, J.B.S. has suffered physical and psychological trauma, suffered emotional distress including but not limited to feeling ostracized from and made fun of by her classmates, and was unable to participate in school activities for an extended period. J.B.S. was thus effectively excluded from participating in and denied benefits of Defendant's education program because of the deliberate indifference to the sexual harassment she suffered.

WHEREFORE, Plaintiff demands judgment for damages, including pre-judgment and post-judgment interest to the extent allowed by law, plus costs of suit, and demands trial by jury of all issues.

### Jury Demand

Plaintiff demands a trial by jury on all issues so triable.

WHEREFORE, Plaintiff prays that upon final judgment, she may have and recover: judgment against Defendant; pre-judgment interest as allowed by law; post-judgment interest as allowed by law; actual damages; costs of suit; attorneys' fees; and any other such relief, at law or equity, to which Plaintiff may be justly entitled.

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was e-filed and served, pursuant to the amendments of Rule 2.516, Fla. R. Jud. Admin., this 24th day of January, 2022, to: Francis H. Sheppard, Esq./Candy L. Messersmith, Esq., Rumberger Kirk & Caldwell, 300 S. Orange Avenue, Suite 1400, Orlando, FL 32801, (fsheppard@rumberger.com, cmessersmith@rumberger.com; lgriffin@rumberger.com;                                        cmessersmithsecy@rumberger.com;

docketingorlando@rumberger.com;                    fsheppardsecy@rumberger.com;

bgiovenco@rumberger.com).

*/s/ Olivia T. Kronenberg*

**DAVID A. PAUL, ESQ.**
Florida Bar No.: 0021385
**OLIVIA T. KRONENBERG, ESQ.**
Florida Bar No.: 104830
**PAUL | KNOPF | BIGGER**
840 South Denning Drive, Suite 200
Winter Park, FL 32789
Phone: (407) 622-2111; Fax: (407) 622-2112
*Attorneys for Plaintiff*
pkbmailroom@projects.filevine.com
olivia@pkblawfirm.com
kim@pkblawfirm.com

# EXHIBIT A

**EXHIBIT A**

IN THE CIRCUIT COURT FOR ORANGE COUNTY,
FLORIDA                              PROBATE DIVISION

IN RE:  GUARDIAN ADVOCATE FOR
███████████████,

*Developmentally Disabled Adult*

File No.   482017CP003614A000XX
Division

## ORDER APPOINTING GUARDIAN ADVOCATE OF THE PROPERTY PURSUANT TO CHAPTER 393.12 (2) FLORIDA STATUTES

This matter came on to be heard on the Petition for the Appointment of a Guardian Advocate of the Property for ████████████████, hereinafter referred to as "Disabled Adult", and it appearing to the Court that the Disabled Adult needs protection for her person and property because she lacks the decision making ability to do some tasks necessary to care for her person and property, it is

ADJUDGED that Chantel Denise Preston, hereinafter referred to as "Guardian Advocate", who was previously appointed by this Court as the Guardian Advocate of the Person is now hereby appointed as Guardian Advocate of the Property of ██████████████, a developmentally disabled adult.  The Guardian Advocate is subject to all of the duties and responsibilities of a Guardian under Chapter 744 Florida Statutes.  It is further

ADJUDGED that she suffers from developmental disability and delays, initially diagnosed with Downs Syndrome as a young child.  It is further

ADJUDGED that this Court finds that as a result of the disabilities set forth above, the Disabled Adult is unable to do the following:

a. to marry (subject to court approval);
b. to apply for government benefits;
c. to travel without supervision;
d. to contract;
e. to sue and defend lawsuits;
f. to manage property and income;
g. to make any gift or disposition of property;
h. to determine her residence;
i. to consent to medical treatment; and
j. to make decisions about her social environment or other social aspects of her life.  It is further

ADJUDGED that the Guardian Advocate shall continue to have the authority and power to make any and all personal decisions on behalf of the Disabled Adult, pursuant to this Court's prior <u>Order Appointing Guardian Advocate of the Person Only</u> dated July 2, 2018.

ADJUDGED that Guardian Advocate shall have the authority and power to make any and all property decisions on behalf of the Disabled Adult, including, but not limited to the following:

A.  the right to apply for government benefits;

B.  the right to contract;

C.  the right sue and defend lawsuits, including but not limited to, the ability to employ attorneys and other professionals, file and settle lawsuits and sign releases;

D.  the right to manage property and income;

E.  the right to retain assets owned by the Disabled Adult;

F.  the right to receive assets from fiduciaries or other sources on behalf of the Disabled Adult;

G.  the right to vote stocks or other securities in person or by general or limited proxy or not vote stocks or other securities;

H.  the right to insure the assets of the Disabled Adult against damage, loss, and liability and insure herself against liability as to third persons;

I.  the right to execute and deliver in her name as Guardian Advocate of the Property any instrument necessary or proper to carry out and give effect to this Order or any other Order of the Court;

J.  the right to pay taxes and assessments on the Disabled Adult's property;

K.  the right to pay valid encumbrances against the Disabled Adult's property in accordance with their terms;

L.  the right to pay reasonable living expenses for the Disabled Adult, taking into consideration the standard of living, age, health, and financial condition of the Disabled Adult;

M.  the right to make elections in any probate or other Court proceeding on behalf of the Disabled Adult;

N. the right to deposit or invest liquid assets of the Disabled Adult, including money received from the sale of other assets, in federally insured interest-bearing accounts, readily marketable secured loan arrangements, money market mutual funds, or other prudent investments. The Guardian Advocate of the Property may redeem or sell such deposits or investments to pay the reasonable living expenses of the Disabled Adult as provided herein;

O. the right to pay incidental expenses on behalf of the Disabled Adult;

P. the right to sell or exercise stock subscription or conversion rights and consent, directly or through a committee or other agent, to the reorganization, consolidation, merger, dissolution, or liquidation of a corporation or other business enterprise;

Q. the right to, when necessary, employ persons to advise or assist in the performance of the Guardian Advocate of the Property's duties, including attorneys, auditors, investment advisers, care managers, or agents, even if they are associated with the Guardian Advocate of the Property;

R. the right to execute and deliver, in her  name as Guardian Advocate, any instrument that is necessary or proper to carry out the Orders of the Court;

S. the right to hold a security in the name of a nominee or in other form without disclosure of the interest of the Disabled Adult; and

T. the right to pay or reimburse costs incurred and reasonable fees or compensation to persons, including attorneys, employed by the Guardian Advocate from the assets of the Disabled Adult.  It is further

ADJUDGED that the Guardian Advocate of the Property shall post a bond in the amount of $ *Reserved* , payable to the Governor of the State of Florida and to the Governor's successors in office, conditioned on the faithful performance of all duties by the Guardian Advocate, according to Florida law. It is further

ADJUDGED that the Guardian Advocate shall not be required to file an annual physician's evaluation form and may file a Simplified Annual Plan.

ORDERED in chambers at Orlando,  Orange County, Florida, this *13th* day of ____*May*____, 20 *19*.

_____
CIRCUIT JUDGE

Copies furnished to:
GADeservice@GendersAlvarez.com